UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| THE ESTATE OF JOHN ARAMA, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-CV-381-JD |
| | ) | |
| BRYANT WINFIELD and | ) | |
| P.B. INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is a tort case in which Plaintiff, The Estate of John Arama ("Arama"), asserts a

claim for negligence against Defendants Bryant Winfield and his employer, P.B. Industries, Inc.

On June 17, 2013, at approximately 3:55 a.m., Arama was operating a motorcycle eastbound on

Interstate 80 near Gary, Indiana. For unknown reasons, Arama became separated from his

motorcycle and landed in one of the lanes of travel. Shortly after this, a semi-truck driven by

Winfield came upon the scene and hit Arama, who incurred fatal injuries as a result of the

collision.

Now before the Court are motions filed by each party seeking to strike testimony of the

opposing party's expert witnesses [DE 40, 42, 45].[1] The motions are fully briefed and ripe for

ruling. The parties are DIRECTED to read the entirety of the order with respect to the limitations

imposed on the testimony of each expert witness.

---

[1] Plaintiff's motions (actually filed as Memorandums) seek to exclude the expert opinions of G.
Stanley Sangdahl [DE 40] and Jack L. Auflick [DE 42], while Defendants' motion seeks to
exclude the expert opinions of Kevin A. Rider and Anita Kerezman [DE 45].

# I. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admission of testimony by expert witnesses. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the following criteria are met:

 (a) the expert's scientific, technical, or specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
 (b) the testimony is based on sufficient facts or data;
 (c) the testimony is the product of reliable principles and methods; and
 (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702, as a conjunctive test, requires all four criteria be met.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court emphasized the court's "gatekeeping" role in ensuring that expert testimony meets the criteria set forth in Rule 702. 509 U.S. 579 (1993). Thus, the court must ensure that any expert testimony admitted is "not only relevant, but reliable." *Id.* at 589. A court, however, does not evaluate "the ultimate correctness of the expert's conclusions." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (quoting *Shultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court is required to consider only the "principles and methodology," not the conclusions generated. *Shultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

**II. DISCUSSION**

Each party has retained two expert witnesses to offer opinions that relate to the issue of liability in this case—that is, whether Winfield could or should have avoided hitting Arama. Central to the dispute is Winfield's versions of the accident. When deposed,[2] Winfield indicated that he saw a dark object (possibly a tire tread) beyond his headlights and he slowed his vehicle to 20 miles an hour. He further indicated that once his headlights hit the object, he could tell it was a person, but he also stated that it wasn't until a truck in front of him switched lanes when he realized that the object (now 20 to 30 feet away) was a person. Winfield's statement to police taken immediately after the accident reveals no reference to another vehicle being in front of him thereby blocking his view [DE 53-6 at 8].

The Court now addresses Plaintiff's objections to Defendants' experts, and then addresses Defendants' objections to Plaintiff's experts.

**A.     OBJECTIONS TO DEFENDANTS' EXPERT WITNESSES**

Plaintiff claims that Defendants' expert witness reports are not founded on sufficient data, nor are the experts' conclusions the product of reliable principles and methods. Plaintiff argues that both experts merely parrot the statements of Winfield and others without applying any scientific methodology to the statements.

**1.     G. Stanley Sangdahl, P.E.**

Mr. G. Stanley Sangdahl ("Sangdahl") holds a Bachelor's degree in mechanical engineering and is a licensed professional engineer in Illinois [DE 40-1 at 10]. He is accredited by the Accreditation Commission for Traffic Accident Reconstruction and has engaged in

---

[2] Neither party provided the Court with a copy of Winfield's deposition; however, his testimony is referred to at various times throughout the experts' depositions.

continuing education in the field of accident reconstruction. *Id.* at 12-13. Given his extensive education and experience, Plaintiff does not question whether Sangdahl is qualified to give opinions regarding the dynamics of the vehicular accident. For this reason, the Court considers Plaintiff's sole argument concerning whether Sangdahl's opinions employ scientific expertise so as to be helpful to the jury.

Sangdahl's investigative report indicates that after reviewing various materials and personally inspecting only Arama's motorcycle in 2015 [DE 40-1 at 3-4], he arrived at five conclusions, as follows:

1. John Arama became separated from his Roadhawk trike, likely from contact with an unidentified vehicle, and came to rest in the second lane from the right on eastbound Interstate 80/94. He was dressed in black leather pants and jacket.

2. As Bryant Winfield approached the area where John Arama lay, his initial view of the road ahead was blocked by another tractor semi-trailer rig. Additionally, there were other vehicles on either side preventing him moving to another lane of travel. When these and other surrounding vehicles ahead of Mr. Winfield began to slow, he slowed his truck to match their speed but would have initially lost his safe following distance.

3. Mr. Winfield was unaware of the presence of Arama until the tractor semi-trailer unit ahead of Mr. Winfield moved to another lane. Because of the traffic conditions Mr. Winfield could not avoid contact with John Arama.

4. None of the safety violations found by the Indiana State Police Commercial Vehicle Inspection of Bryant Winfield's tractor semi-trailer rig were a factor in this accident. The notes violations were strictly compliance issues and would not have any significant impact on performance.
a) There is no evidence that Mr. Winfield was fatigued or distracted during the time prior to the accident.
b) The issues with the high beam headlights, hazard lights and turn signal are moot since none of these lights were in use at the time of the incident.
c) The inoperative brake on the trailer would have reduced the braking capability by less than 10% which is equivalent to approximately 2 feet of additional stopping distance at 20 mph in an emergency. Normal braking would not have been noticeably effected (sic) at all.
d) The small air leak in the fitting at the left front brake would not have any negative impact on braking. The brake stroke measured at this brake was normal.
e) Other violations found were determined to have been caused during the accident and therefore did not exist prior to the accident.

5. This accident would have occurred in exactly the same manner if none of the violations existed.

[DE 40-1 at 7-8]. Plaintiff argues that conclusions numbered 2-5 should be excluded from evidence because Sangdahl merely relies on the testimony of and reports by others at the scene of the accident without utilizing Sangdahl's expertise to support his conclusions.

The Court agrees. Sangdahl's deposition testimony makes clear that he did not use any sort of specialized knowledge or reliable methodology to reach conclusions numbered 2-5 [DE 40-2]. When asked about the basis for his second conclusion—that is, Winfield's initial view of Arama being blocked by another rig and Winfield's loss of his safe following distance—Sangdahl admitted that he drew those conclusions based solely on the testimony of others because there was no physical evidence available from which to make such determinations [DE 40-2 at 3-4]. In fact, Sangdahl confirmed that he did not know where in the roadway Winfield was when Arama became separated from his bike, how close Winfield was to the vehicle in front of him, where Winfield began to slow down, or when "or even if" Winfield ever really lost a safe following distance [DE 40-2 at 4-5]. Nor did Sangdahl know the length of Winfield's truck or his rate of deceleration. Sangdahl testified that there was "no testing" conducted or "scientific method" employed in making this conclusion, and he admitted that if Winfield did not accurately report the incident, then this conclusion would be flawed. In other words, Sangdahl has done nothing in arriving at his opinion that the jury could not do based on the actual eyewitness accounts of the accident.

Throughout his deposition, Sangdahl's responses concerning the basis of his other conclusions revealed more of the same. For instance, when asked about the basis for his third conclusion—concerning Winfield's being unaware of Arama's presence and inability to avoid

hitting Arama—again, Sangdahl testified that his opinion was not founded on any sort of physical evidence or scientific testing that allowed for any independent analysis; rather, he simply relied on a portion of Winfield's testimony indicating that Winfield saw Arama about 30 feet in front of him once the truck ahead of Winfield changed lanes [DE 40-2 at 8]. But even assuming these facts are true, Sangdahl did not then draw on his experience/knowledge to explain why these facts would support his conclusion that Winfield couldn't avoid hitting Arama. In fact, when asked to actually utilize a mathematical calculation based on Winfield's other deposition testimony—that Winfield was traveling about 20 miles per hour when he initially saw something in the road once his headlights hit the object (approximately 250 feet ahead)—Sangdahl conceded that Winfield could have stopped more than once before hitting Arama [DE 40-2 at 6-8, 15, 20]. Sangdahl's deposition response supports the finding that his third conclusion is not testimony based on any calculation or expertise. Instead, it merely repeats Winfield's testimony that he was unaware of the presence of Arama until it was too late.

In essence, Sangdahl merely regurgitates the testimony of defense witnesses so as to lend further credibility to that testimony based solely on Sangdahl's credentials. However, in order to be helpful to the jury, as is required under rule 702(a), an expert must actually draw on their expertise in reaching their conclusions and must testify to something more than what the jury can understand or decide for itself. *Ancho v. Pentek Corp*., 157 F.3d 512, 519 (7th Cir. 1998). Thus, expert testimony that does little more than offer a credibility opinion is typically not admissible. *Goodwin v. MTD Prods., Inc*., 232 F.3d 600, 609 (7th Cir. 2000) (noting that, in general, "an expert cannot testify as to credibility issues," since "credibility questions are within the province of the trier of fact"); *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to

believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury."). Unless the expert uses his expertise to add something to the jury's ability to understand the evidence or evaluate a witness' credibility, those matters are left to the jurors to decide for themselves. *United States v. Hall*, 93 F.3d 1337, 1343–44 (7th Cir. 1996). Likewise, an expert typically "cannot be presented to the jury solely for the purpose of constructing a factual narrative upon record evidence." *Newman ex rel. Newman v. McNeil Consumer Healthcare*, No. 10 C 1541, 2013 WL 9936293, at *6 (N.D. Ill. Mar. 29, 2013). Nor is a witness allowed, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion. *See King–Indiana Forge, Inc. v. Millennium Forge, Inc*., No. 1:07–cv–00341-SEB-DML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009). Because Sangdahl's second and third conclusions merely parrot what Winfield and other eyewitnesses have said and construct a factual narrative based upon record evidence, his testimony would not assist the trier of fact any more than the jury's hearing from those witnesses on whom Sangdahl's opinions rely. Fed. R. Evid. 702 (requiring that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.").

As to Sangdahl's fourth and fifth conclusions—that none of the safety violations were a factor in contributing to the accident—Sangdahl admitted to formulating this conclusion by merely relying on Winfield's assertions that he conducted a pre-trip inspection and was not distracted or tired at the time of the accident. When deposed, Sangdahl acknowledged that he could not determine when some of the equipment failures actually occurred, that he could not verify that Winfield wasn't fatigued or distracted, and that had Winfield been able to use his high beams (which were found to be nonoperational), then Winfield's field of vision would have been

illuminated much further ahead [DE 40-1 at 7; DE 40-2 at 9-13, 17, 19]. Despite these concessions, Sangdahl's report and conclusions do not account for the possibility that some combination of these safety violations could have played some role, even if minimally, in contributing to Winfield's failure to avoid hitting Arama. *Id*. Thus, Sangdahl's report and deposition make obvious that he did not account for possible alternative causes to the accident, he did not rely on any studies to verify his conclusions, and he did not employ data or analysis as a basis for his sweeping conclusion that the numerous safety violations played no part in the accident's occurrence. Without use of his expertise to render his opinions, Sangdahl's conclusions are inadmissible. *See e.g., Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (an "expert's work is admissible only to the extent it is reasoned, uses the methods of discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology."); *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657-58 (7th Cir. 1998); *Barton v. Safeco Ins. Co. of Ill.,* No. 2:08CV206, 2009 WL 3617678, at *6 (N.D. Ind. Oct. 29, 2009) (excluding expert's testimony as unreliable and unable to assist the trier of fact because expert did not go through any analysis or testing to arrive at his opinion regarding the locations of the vehicles before the collision).

Accordingly, Sangdahl's conclusions numbered 2-5 are excluded from trial for failing to meet the requirements of Rule 702, and Plaintiff's motion [DE 40] is GRANTED in this respect.

## 2. Jack L. Auflick, Ph.D.

Defendants hired Jack L. Auflick ("Auflick"), who holds a doctorate in Human Factors Psychology, as an expert witness to examine human factors and visual conspicuity aspects of the accident based on his extensive experience with analyzing human error within complex and hazardous operational environments. Given his extensive education and experience, Plaintiff

does not challenge Auflick's qualifications. Instead, similar to Plaintiff's challenge to Sangdahl, Plaintiff argues that Auflick's conclusions lack a scientific basis and his testimony amounts to unsupported speculation.

Auflick's investigative report indicates that after reviewing various materials and conducting a limited inspection of the accident scene over two years after the accident [DE 41-1 at 2-3], he arrived at five conclusions, as follows:

1. Mr. Winfield was operating his tractor and semi-trailer in a safe manner as he first observed the dark hazard, and slowed down to approximately 20 mph.

2. As Mr. Winfield approached the area where John Arama lay, his initial view of the road ahead was blocked by another semi-trailer rig. In addition, there were other vehicles on either side of him that prevented Mr. Winfield from moving to another lane of travel. When these vehicles ahead of and near Mr. Winfield began to slow, he alertly detected the slowing traffic and began to slow his truck to match their speed. As he responded to the changing road conditions, he may have lost some of his initial safe following distance as the leading truck moved to the right lane.

3. There was limited ambient illumination at the scene that made it very difficult to perceive that the object in the road was a human and not a roll of carpet or a dislodged tire tread.

4. Because of the other trucks located to Mr. Winfield's right and left, he could not change lanes to avoid the object. As Mr. Winfield approached, he tried to straddle the hazard and subsequently realized it was a body, although he still had no other option to allow him to swerve to the right or left.

5. "The primary cause of this crash is the rider of the Roadhawk motorcycle had a collision with an unidentified object or vehicle, resulting in the rider getting ejected. As the rider was on the ground, oncoming traffic took evasive maneuvers to avoid the downed rider and unoccupied motorcycle." [citing to conclusion on page 14 of the Indiana's Officer's Standard Crash Report dated 6/17/2013].

[DE 41-1 at 8, *numbering added for ease of reference*]. Plaintiff argues that all of the conclusions numbered 1-5 should be excluded from evidence because Auflick does not rely on any scientific expertise to support his conclusions. For the reasons detailed below, the Court agrees with Plaintiff, except as to Auflick's third conclusion.

Auflick's report contains a considerable amount of scientific information known to him concerning human visual acuity of objects in different illumination settings, the effectiveness of headlights in illuminating an area, and the effect of driver expectancy on responses [DE 41-1 at 4-7]. Auflick's third conclusion—that limited ambient illumination would have made it difficult to identify the object in the road—relies on this scientific information and Auflick's expertise. Plaintiff's sole basis for excluding this conclusion is that Auflick did not personally measure the amount of lighting available at the scene of the accident. However, this does not serve as a basis for excluding the conclusion because Auflick was not required to personally take light measurements where he relied on measurements previously taken at the scene (although after the accident) by Plaintiff's own expert. *See* Fed. R. Evid. 703. Moreover, to the extent it is debatable whether the road conditions, traffic, and street lights were in substantially the same condition when measured compared to the accident's occurrence, these factual underpinnings would be the proper subject of cross-examination of both parties' experts. *See, e.g., Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis."). Because Plaintiff points to no legitimate basis for striking the third conclusion, Auflick is entitled to rely on his education and experience to indicate the level of difficulty a person would likely have in identifying an object under a particular set of circumstances, such as those documented in the reports and eyewitness accounts Auflick reviewed.

As for the remainder of Auflick's conclusions numbered 1-2 and 4-5, Auflick has failed to employ any sort of expertise in making them. The conclusions represent nothing more than

direct statements from Winfield, an eyewitnesses truck driver (who, after avoiding Arama, pulled over to call 911), and the officer's crash report. In his deposition, Auflick admitted that his conclusions numbered 1, 2, and 4—concerning the manner in which Winfield operated his truck and the location of vehicles immediately before the accident—rely solely on testimony from Winfield and another truck driver [DE 41-2 at 3-4, 10, 24, 29-31]. Auflick conceded that he did not verify the location of other vehicles, he did not verify Winfield's speed, he did not test Winfield's headlights, and he really had no way of knowing whether Winfield was driving in a safe manner. *Id*. And despite concluding that Winfield may have lost some of his safe following distance, Auflick did not even know what the standard safe traveling distance was for CDL drivers. *Id.* at 24-25. Thus, it is clear that rather than taking a factual scenario and applying his knowledge to draw conclusions, Auflick merely recounts the factual statements made by Winfield and an eyewitness. Because no amount of expertise was employed, the conclusions do not pass muster under Rule 702. *See Lang*, 217 F.3d at 924 (an "experts' work is admissible only to the extent it is reasoned, uses the methods of discipline, and is founded on data."); *King–Indiana Forge, Inc.*, 2009 WL 3187685, at *2.

The Court also strikes Auflick's fifth conclusion because it is not his conclusion at all; rather, it is the investigating police officer's conclusion which was formed after the officer conducted an on-site reconstruction of the accident [DE 53-6 at 14] (stating that "[t]he primary cause of this crash is the rider of the Roadhawk motorcycle had a collision with an unidentified object or vehicle, resulting in the rider getting ejected. As the rider was on the ground, oncoming traffic took evasive maneuvers to avoid the downed rider and unoccupied motorcycle."). While an expert is entitled to base his opinion on facts deduced by another expert, *see* Fed. R. Evid. 703, Auflick confirmed that he was hired only to provide an opinion about Winfield's

perception, not about accident reconstruction [DE 41-2 at 5, 15, 28-29]. Therefore, Auflick did

not verify the location of any vehicles, and according to his own words, his report has "nothing

to do with the accident reconstruction." *Id*. Given this, Auflick does not possess the requisite

personal knowledge to verify the accident reconstructionist's conclusion as to how the accident

was caused. Because Auflick has no scientific basis for making this fifth conclusion, let alone

one grounded in his personal knowledge base, this conclusion amounts to an inadmissible guess

and must be excluded. *See Porter v. Whitehall Labs., Inc*., 9 F.3d 607, 614 (7th Cir. 1993) (citing

*Daubert,* 509 U.S. at 590) (when considering whether the expert's testimony has been subjected

to the scientific method, the court must rule out subjective belief or unsupported speculation).

Accordingly, Auflick's conclusions numbered 1-2 and 4-5 are excluded from trial for

failing to meet the requirements of Rule 702.

**B.** **OBJECTIONS TO PLAINTIFF'S EXPERT WITNESSES**

**1.** **Kevin A. Rider, Ph.D.**

Plaintiff retained the services of human factors expert Kevin A. Rider ("Rider").

Defendants object to Rider's opinions in two ways. First, Defendants challenge Rider's

qualifications on the limited basis of whether he has adequately studied or written about the

adequacy of lighting to identify an object in a roadway[3] [DE 45 at 5]. Second, Defendants pose a

cursory challenge to the methods utilized by Rider by criticizing his use of certain data in his

mathematical calculations [DE 45 at 5; DE 55 at 2].

---

[3] Defendants do not argue that Rider was unqualified to simply calculate braking distance given
a certain speed and reaction time, likely because Rider's extensive education, training, and
experience in the field of engineering [DE 53-2; DE 53-3] demonstrate that he is so qualified.
*See, infra*.

As to Rider's opinions, after reviewing various materials, explaining driver expectancy, behavior, and visibility, and noting relevant safe driving practices, Rider drew the following conclusions:

1. Mr. Winfield was alerted to a potential roadway hazard, and should have slowed to a speed from which he could stop safely if necessary.

2. The combined illumination from the highway pole lights, the headlights from the adjacent vehicles, and Mr. Winfield's own headlights should have provided adequate illumination for Mr. Winfield to detect and identify Mr. Arama as a pedestrian in the roadway.

3. Mr. Winfield had enough time and distance to detect, identify and brake to avoid a collision.

4. With adequate illumination available, and enough time and distance to detect, identify and respond, a reasonably attentive driver would have been able to avoid this collision.

5. Mr. Winfield's failure to respond in enough time to avoid the collision is consistent with the effects of distracted and/or fatigued driving.

[DE 53-1]. Rider's report explains that his conclusions were premised in part on Winfield's testimony that he was traveling 20 mph and could see a person in the roadway when his headlights illuminated the object (at about 250 feet), along with a reaction time of 1.5 seconds [DE 53-2 at 14-16]. The results of Rider's calculation indicate that Winfield would have traveled 44 feet after detecting Arama and still had over 200 feet and almost 7 seconds to brake [DE 53-2 at 15].

As to Rider's qualifications to render opinions premised on variant illumination and visibility (namely concerning conclusions 2-4), Rider's curriculum vitae, deposition, and affidavit [DE 53-2; DE 53-3] reveal that Dr. Rider's Master's and Ph.D. programs (completed

over 10 years ago) focused on human factors, perception, and response.[4]  As a participating member of the Human Factors and Ergonomics Society technical groups, Rider dealt with research on the topic of surface transportation, as well as perception and performance. Rider has taught human factors and industrial engineering courses on both visibility and illumination, and he has reviewed generally accepted scientific articles and research on illumination and visibility given his profession in forensic engineering. Rider also passed an 8-hour examination to become a Certified Professional Ergonomist which included testing on illumination and visibility. He once gave a presentation relating to nighttime illumination issues during the National Interstate Trucking Conference in 2015, and he has acted as an expert witness in various vehicular accident cases involving variant lighting. Based on this evidence, the Court rejects Defendants' contention that Rider is not sufficiently versed in the adequacy of lighting for a driver's discernment of objects on the road, so as to be qualified under Rule 702 to render opinions on that subject.

As to the reliability of the opinions, Defendants challenge Rider's methodology by criticizing the numbers he used in his mathematical calculations. Defense counsel relies on *Smith v. Ford Motor Co*., 215 F.3d 713, 719 (7th Cir. 2000) for the proposition that the court must be concerned with the soundness of the factual underpinnings of the expert's analysis [DE 55 at 2]. Defense counsel further argues that while it may be true that several publications support using 1.5 seconds for a reaction time and 250 feet as the distance illuminated by headlamps, "Dr. Rider did not bring any scientific analysis or evaluation to this case" [DE 55 at 2] by merely performing "some third-grade math" [DE 45 at 5]. The Court wholly disagrees.

---

[4]Rider has a Ph.D. in Industrial and Operations Engineering (Human Factor/Ergonomics, Biomechanics), a Master's degree in Industrial Engineering (Human Factor/Ergonomics, Manufacturing), and a Bachelor of Science in Industrial Engineering [DE 53-2 at 5].

First, *Smith* stands for the complete opposite proposition stated by the defense. In *Smith*, the Seventh Circuit *actually* observed that when evaluating expert testimony the district court "should avoid scrutinizing '[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis.'" *Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887, 896 (7th Cir. 2011) (quoting *Smith*, 215 F.3d at 718). In other words, when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed." *Walker v. Soo Line R. Co*., 208 F.3d 581, 587 (7th Cir. 2000).

Here, Defendants would be hard pressed to argue that the sources of information were inappropriate—given that Defendants' own expert agreed that normal headlights illuminate 250 feet forward, as noted in the CDL manual [DE 40-2 at 21], and that other scientific literature generally accepted within the engineering field supports the numbers Rider relied on for headlight illumination and reaction time [DE 53-2 at 2]. To the extent it is debatable whether these numbers should then be adjusted based on various scenarios supported by the evidence (such as, additional overhead lighting or blocked vision due to vehicle location), this is the proper subject for Rider's cross-examination. *See, e.g., Manpower, Inc.*, 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury"). Second, while the mathematical calculations Rider performed may not be overly complex, the conclusions rendered thereon are not within the knowledge of men of ordinary experience and they will assist the jury in making a decision on the issue of liability. *See, e.g., Mueller v. Cities Serv. Oil Co*., 339 F.2d 303, 308 (7th Cir. 1964)

(allowing expert witness testimony on the time required to stop a vehicle traveling at 20 miles an hour).

The final objection raised by Defendants to Rider's testimony is specifically directed at Rider's ultimate conclusion—that Winfield's failure to respond in enough time to avoid the collision is consistent with the effects of distracted and/or fatigued driving. Defendants argue that this conclusion is based only on speculation, not evidence [DE 55 at 3].

The Court agrees that this conclusion does not employ any data or analysis, as even Rider admitted in his deposition that it was based simply on the fact that an accident had occurred [DE 53-3 at 18, 26, 34]. Rider also acknowledged that he had no evidence to evaluate and determine what was happening inside Winfield's truck immediately before the accident, except for those statements made by Winfield. *Id*. In short, the conclusion that Winfield must have been distracted and/or fatigued amounts to unsupported speculation on Rider's part. *See Porter*, 9 F.3d at 614 (7th Cir. 1993) (citing *Daubert,* 509 U.S. at 590) (when considering whether the expert's testimony has been subjected to the scientific method, the court must rule out subjective belief or unsupported speculation). Thus, Rider's conclusion numbered 5 is excluded, but because Defendants point to no legitimate basis for striking Rider's other conclusions the motion to exclude is otherwise denied.

## 2. Anita Kerezman

Plaintiff retained Anita Kerezman ("Kerezman"), a commercial vehicle operation and safety specialist and director of safety, who, after reviewing various materials, made the following conclusions:

1. Winfield was following too close behind the vehicle ahead and failed to have sufficient time and distance to see and avoid running over Mr. Arama who was lying in the roadway in the 2nd lane.

2. Winfield failed to "Aim High in the Steering, Get the Big Picture and Leave Himself an Out" consistent with industry standards and defensive driver training requirements.

3. Winfield failed to expect the unexpected . . ., failed to anticipate potential hazards ahead and failed to react in time before the hazard became an emergency.

4. Winfield had more than enough time to stop within the range of his low beam headlights had he been keeping a proper lookout and following at a proper distance.

5. The accident/incident was preventable.

6. Winfield was not a properly trained driver who could by reason of training, education, or both, safely operate the commercial motor vehicle he was assigned to drive on the day of the incident pursuant to FMCSR Part 391 (b)(3).

7. Winfield was out-of-service and in violation of multiple FMCSR's at the time of the crash. P.B. Industries was also in violation of multiple FMCSR's and industry standards at the time of the crash.

8. All the failures addressed in this report collectively, are an indication that P.B. Industries failed to have adequate policies, procedures and management controls in place to prevent violations of FMCSR's and crashes caused by lack of training and non-compliance. P.B. Industries failed to ensure Winfield completed his daily driver logs properly and failed to make sure that all defects and deficiencies on the truck were fixed before permitting the truck to be driven on the day of the incident.

[DE 53-5 at 4].

After noting that Kerezman's experience "could qualify her" to give expert testimony, Defendants broadly assert (with little analysis) that her report does not disclose the application of any expertise to the facts of the case [DE 45 at 6-7]. Defendants contend that her "entire testimony," including her eight specified conclusions, should be struck. *Id.*

As to her qualifications (which are reflected in her curriculum vitae [DE 53-4] and deposition [DE 54-7 at 3-9]), Kerezman has almost three decades of trucking experience and is certified by the North American Transportation Management Institute as a Director of Safety. This certification is approved by a university which based its decision in part on her significant experience and requires recertification every three years. Kerezman has served as an expert

witness since 2000 in roughly 50 cases per year, has testified before multiple courts, has given many presentations on the subject of the safe operation of commercial vehicles, and has even written various chapters on trucking safety. She confirmed that she is not an accident reconstructionist, and did not perform any accident reconstruction in this case; rather, she is rendering opinions about how to safely operate commercial vehicles (such as the semi-truck driven by Winfield) based on her experience, training, and knowledge.

As essentially conceded by Defendants, the Court concludes that Kerezman is qualified based on her extensive experience and training to provide expert testimony concerning commercial motor vehicle operation, safety, and defensive driving, regulatory compliance in the trucking industry, and accepted practices/customs in the trucking industry. *See Smith v. Ford Motor Co.*, 215 F.3d at 718 ("While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'") (internal citations omitted)). And except as otherwise denoted below, her methodology of utilizing facts existing in the evidence from which to formulate her conclusions also appears to meet the reliability requirement where she relies on her own extensive experience, training, and knowledge of how to safely operate semi-trucks in formulating her opinions. *See United States v. Pree*, 408 F.3d 855, 871 (7th Cir. 2005) (because the expert testimony fell within his area of expertise, it was deemed admissible expert testimony). Thus, Kerezman may testify about the subjects to which she is qualified (as identified at the outset of this paragraph), including what she meant when she concluded that Winfield's vehicle was "out of service" based on regulatory violations, as stated in her 7th conclusion.

However, because Kerezman did not reconstruct the accident or employ any scientific analysis of the accident scene or location of the vehicles, she is not permitted to put forth unfounded opinions about how she thinks the accident occurred. In other words, her conclusions numbered 1-4 are excluded to the extent she opines that Winfield took or failed to take certain actions thereby causing the accident. Instead, counsel must pose hypothetical questions to Kerezman thereby allowing her to testify about safe driving techniques (such as, maintaining a proper distance and lookout) given particular driving circumstances. *See, e.g.,* DE 54-7 at 14-15, 21-26, 38. To the extent Kerezman's testimony and conclusions numbered 2 and 3 use what Defendants characterizes as "aphorisms"—such as, "Aim High in the Steering, Get the Big Picture and Leave [Your]self an Out" and "expect the unexpected"—the Court rejects the Defendants' argument that these phrases altogether fail to be premised upon technical or other specialized knowledge. As explained by Kerezman in her deposition, when these statements are viewed in the context of her report, they evidence technical language which describes the use of safe and defensive driving techniques. Moreover, these phrases are used in the trucking industry and their meanings are known to Kerezman given her vast experience and training in the safe operation of commercial vehicles. Thus, Kerezman may explain these commercial driving techniques to the jury, but she must do so without drawing the ultimate conclusion about whether Winfield failed to employ them thereby causing the accident. To do so would have required Kerezman to reconstruct this particular accident, which she admittedly did not do. Furthermore, she may also not give naked legal conclusions (e.g., "the driver was negligent" or "the accident was preventable [given unreasonable actions by the driver]"). *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (an expert is not allowed to present legal conclusions; rather, the expert's role is "limited to describing sound professional standards and identifying departures

from them.") (citations omitted). This precludes admission of Kerezman's 5th conclusion that the accident was preventable. Rather, she is qualified to testify as to safe driving means employed by the trucking industry which seek to prevent such accidents.

Finally, the Court excludes testimony concerning whether Winfield was a properly trained driver,[5] whether his training (or lack thereof) was a cause of the accident, and whether P.B. Industries failed to employ adequate policies and procedures to train drivers and prevent non-compliance issues. Kerezman has not set forth a sufficient foundation for these conclusions, as her opinion appears to rest on the mere fact that regulatory violations occurred and Winfield provided incorrect responses to some safety questions [DE 53-5; DE 54-7 at 34-37]. But it doesn't appear that Kerezman even had access to Winfield's entire training and driving history, nor to P.B. Industries' work place polices so as to conduct a proper review and render an opinion thereon. *Id*. Moreover, there is no allegation in the amended complaint [DE 15] that Defendants violated a duty to train or maintain adequate policies, so such testimony would be irrelevant. Thus, Kerezman's conclusions numbered 6 and 8 are excluded.

The Court has set forth a number of parameters regarding the admissibility of Kerezman's testimony and conclusions, and the parties are expected to comply with the restrictions ordered herein.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's motion to exclude the conclusions of Stanley Sangdahl [DE 40] is GRANTED in so far as conclusions numbered 2-5 are excluded; the

---

[5] This does not prevent Kerezman from testifying about custom, practice, and safety regulations in the trucking industry, nor does it prevent cross-examination of Winfield concerning his knowledge of these subjects. Rather, it prevents Kerezman from drawing the ultimate conclusion that Winfield was (or wasn't) properly trained and/or that his training (or lack thereof) was a cause of the accident.

Plaintiff's motion to exclude the conclusions of Jack Auflick [DE 41] is GRANTED IN PART

AND DENIED IN PART, resulting in the exclusion of conclusions numbered 1-2 and 4-5; and

Defendants' motion to exclude the testimony of Kevin Rider and Anita Kerezman [DE 45] is

GRANTED IN PART AND DENIED IN PART, as detailed herein. The parties are DIRECTED

to read the entirety of the order given the detailed rulings limiting the testimony of each expert

witness.

      SO ORDERED.

      ENTERED: May 11, 2017


                                         /s/ JON E. DEGUILIO
                                 Judge
                                 United States District Court